Will your argument now in the case of United States v. Williams? Good morning, Your Honor. May it please the Court? Your Honor, I would like to focus on the arguments, particularly regarding substantive and procedural errors by the district court during the sentencing hearing for Mr. Williams. Now, there are several of the arguments that are also mentioned in my brief, but I would like to at least start in focusing on those main errors. The basis of the—start with the procedural errors—the basis of the procedural errors is that the district court did not explain its reasoning in dealing with the main argument of the unwarranted sentencing disparities among defendants. And what I mean by that is, during the sentencing hearing, there were several individuals that testified on behalf of the government. There was a Ricky Rapp who received a sentence of 15 years, a Ronnie Bottke who admitted to selling drugs at the flophouse where an individual actually died from an overdose, although that person claimed that they had nothing to do with it. But this—that individual, Mr. Bottke, was never charged with a federal case and only received a sentence of possession, simple possession, at the state level where he received—his sentence was served at 50 percent. You had a Dustin Test who received 190 months, a William Zamaro who, quite honestly, is very disturbing in the disparity here in that this individual admitted to giving another victim of overdose— Mr. Beals, it sounds like you're making an argument to the sentencing judge, which we're not, right? Have we ever held that a sentencing judge erred by imposing a sentence within the guidelines that it erred on the ground of excessive disparity? No, Your Honor, I don't have a— necessarily reflects proper attention to the need to avoid unwarranted disparities. Now, it sounds like you're asking us not only to do something for the first time, but to disagree with the Supreme Court in the process, and that's usually not something we are anxious to do. Well, Your Honor, I am asking the court to do something for the first time, not necessarily to disagree with the Supreme Court in Gaul. In this situation, under 18 U.S.C. 3553A6, the court does have a directive to avoid unwarranted sentencing disparities. And the Supreme Court said in Gaul that a district judge who imposes a sentence within the guideline range, and I quote, necessarily gave significant weight and consideration to the need to avoid unwarranted disparities. You're asking us to hold otherwise. Well, Your Honor, now, under Gaul, that would be an argument under substantive error. Now, in this situation, we're talking about—I'm initially talking about a procedural error. Now, procedurally, the court still has a responsibility to explain any issues regarding any arguments made by the defense under 3553, and even though the court did give a within-guideline sentence at the time of the sentencing, the court still has a responsibility to explain its sentence. Particularly any arguments that are of merit, and I believe in this situation, the arguments by the defense made during sentencing were very much so of merit. It's difficult to look at the record where you see the wide range of sentences that these individuals received based on similar conduct, and I would argue same conduct. Many of the individuals who testified on behalf of the government admitted to having a significant number of meth customers, and all of their sentences were well below my client's sentence, who received a sentence of 30 years, and some individuals— We don't tell you how to allocate your time, but half of your time is gone, and you may want to address other arguments. I appreciate that from the court. Just also—and just wrapping up my argument regarding procedural due process, Your Honor, in light of the fact that so much of the argument that was made at the sentencing hearing was made regarding the unwarranted disparities, I believe that the court still had a duty, even under Gaul, even though the court did give a sentence in the guideline range, it had a duty to address the reasons why my client received such a large sentence in comparison to the other defendants. Now, it's also—I wanted to also address—there were some other issues that the court mentioned. One was that the court mentioned that in making one of his explanations that my client did not have a drug habit. I just want to just touch on that briefly. My client's drug habits were mentioned in the PSR. Also, my client's sister testified during the sentencing hearing that he did have a drug habit, so there was evidence presented during the sentencing hearing that would have addressed that, that the court also ignored. Are you arguing that he was addicted to meth? What I'm arguing, Your Honor, is that my client had a drug habit. I'm not necessarily arguing that my client was addicted to meth as opposed to the fact that he did have a drug habit. And one of the reasons—and this goes, again, not to try to belabor and continue to use additional time of mine on the procedural argument, but that does go back to the procedural issue. The court, in making—in delivering its sentence, seemed to allude to the fact that these other individuals were meth addicts or, i.e., drug addicts, and that was a—to some explanation as to the difference in sentencing. When, in fact, my client was a drug addict, to say that an individual who has a drug addict other than being a meth addict, and because they have—they're not a meth addict, but they are a drug addict, somehow they are more culpable in the distribution of meth than other individuals, that also is just—it's not a good explanation. And that explanation was without merit. So— The judge did give some additional reasons beyond that. I know you're—we're hinging on you sold for your financial gain while the other defendants were drug users, which make you more culpable. The judge also went a little further and said, but this is the reason why your sentence is higher. You controlled and managed the network. You have the most methamphetamine that was available to sale. You directed where the purchases would occur. You cut some dealers out. He also argued you have stated and gave the statement, you have provided me with anything today to seriously consider going below the guidelines. He noted on the record that Thomas Wright, another defendant, had received 300 months in imprisonment, and the judge went further and said, I'm going to—the reason why yours is justifiable as to why to go higher, there's not any question that you were the supplier for these other—I'm going to call them co-conspirators. Well, your—one, it's difficult to call them co-conspirators, especially since there was evidence presented at the sentencing that in many respects they were competitors. Two, many of these individuals also admitted to having networks of clients at the same number of clients as my client had. Three, Mr. Wright, that individual that the court specifically mentioned, who had a 300-month sentence, is a career offender, and his background is significantly worse than my client's background. So that's kind of a— Did Mr. Wright threaten three of the 11 witnesses? Well, there again, regarding threats to the later witnesses, we have no idea whether Mr. Wright threatened any of his customers who owed money. Now, regarding the likelihood of the actual threats, there was some conflicting evidence regarding that. I mean, you had some statements that my client supposedly threatened the client was looking for him, and yet he was with another client. Well, I see my client and my time is getting ready to run out. If it pleases the Court, I can— You can finish answering Judge Rogner's question. There was evidence to show that when my client was allegedly looking for one of his clients who supposedly owed him money that he was making threats to, he was with a Mary Lazari. And when he was with Mary Lazari, he was actually pulled over by the police. He was actually searched by the police, and I believe he was taken into custody by the police briefly. And with him being searched, it shows that he was not charged with possession of a weapon or even possession of drugs. So that contradicts some of the government's witnesses' statements that supposedly he's making these threats and he's this violent individual. Now, the other alleged threats— Judge Rogner, do you want to follow up? No, thank you. Thank you very much, counsel. Thank you. Thank you. Mr. Bertrand. Good morning, Your Honors. May it please the Court, counsel. My name is Nathan Bertrand. I'm appearing here today on behalf of the United States. And we're asking in this case that the district court sentence be affirmed as it was procedurally correct and was substantively reasonable. Just to jump in on a point that was made by Judge Pryor in talking about the sentencing disparity. The judge in this case at the district court level acknowledged the defendant's criminal history. It referenced his tragic childhood, acknowledged the testimony of his family, and then went on to explain the breadth of his criminal conduct. As was pointed out, citing Mr. Wright's 300-month sentence as the highest so far and then providing a detailed explanation as to why the defendant in this case was going to receive more punishment. Yes, the government's witnesses were drug dealers. The defense counsel here said there were several witnesses. To be clear, 10 drug dealers were cooperating and testified as to how many customers they had and that the defendant in this case was their either sole or primary supplier. The judge explained the defendant in this case was on a higher spot within the drug trafficking pyramid. He was the one supplying all of these drug dealers with the methamphetamine that they were then selling in Peoria and Tazewell County. To address the point of the drug habit, the government pointed out in its argument, I believe it's page 382 and 83 of the transcript, that there were some inconsistencies with what the defendant was telling probation at various times in his interviews. It was essentially saying that the defendant was trying to gain favor from the court by portraying himself as a drug addict when in fact he may not have been. The court even specifically said on page 419 that it did not believe that the defendant was selling simply to support his habit like some of the government's witnesses were. Just to address a few of the other points that the defendant brought up in terms of the issue with the purity of the methamphetamine in this case, the defendant waived that claim at no point did he object in the pre-sentencing report or at sentencing as to the purity. He in fact stipulated to the base level offense here and counsel explained at sentencing that this was a strategic decision. The threshold here for that base level offense was 4.5 kilograms of methamphetamine actual. The government was showing evidence at sentencing of 48 kilograms that the accused could be held accountable for. In fact, defense counsel explained that to maintain the objection would have been frivolous. What evidence, assuming that it was not waived, what evidence do we have to support the drug purity used in the PSR calculation? Yes, so in the PSR there were five separate paragraphs in which drugs have been tested by the DEA laboratory here at the north central Chicago laboratory citing that it was either 100% purity, 98% purity, and then at sentencing a chemical analysis report was submitted to correct the PSR showing that on another occasion drugs that came from the accused tested at 96% purity. So there were multiple instances where drugs attributable to the defendant were tested and were above the threshold to be methamphetamine actual. And in regards to the sentencing enhancements for the threats and the firearms, again, numerous witnesses testified that they had either seen the defendant with the firearm, a few said they had sold him firearms or traded him firearms in return for methamphetamine or to settle their debts, and numerous individuals testified that they had either been personally threatened or they had seen the defendant threaten other individuals and text messages were actually introduced at sentencing showing some of those threats. Unless there are any additional questions for me, the United States would rely on our brief, and we respectfully request that this court affirm the district court sentence. Thank you. Thank you very much. And Mr. Beals, we appreciate your willingness to accept the appointment in this case. The case is taken under advisement.